against Eric Woods, case number 518-0336. And I'm going to call the roll on this one. Council for the appellant, you may proceed. Thank you, Your Honor. As may it please the Court, counsel, for the record, I am Patrick Daly, appearing here on behalf of the state. We're not used to seeing you go first. I prefer it the other way, but that's okay. There are two considerations that I want this Court to think about in determining whether or not the trial court's decision should be affirmed or reversed. Number one, really a threshold concern, were the police officers in this case engaged in a reasonable exercise of the community caretaking function from the outset through the conclusion of this case? Do the objective facts viewed in the totality of the circumstances establish that they were engaged in a proper community caretaking exercise? The second, and I think trickier, interesting consideration in this case is the interplay between a valid community caretaking exercise and police officers' investigatory duties and the relationship between these in view of the United States Supreme Court's admonition in its original definition of a community caretaking enterprise is that there has to be a complete divorce between the officers' duties or obligations or actions under the guise of community caretaking and the police officers' investigation of the commission of a crime. This case, I think, looked at factually implicates both of those concerns, and that really comes down to the ultimate question here is if this Court finds that these officers were engaged in community caretaking throughout, that this was not simply a subterfuge by the police to get into the home to look around in order to, you know, garner evidence to prosecute this particular defendant, does Katie's requirement of the divorce of the community caretaking and the investigatory tasks mean that there has to be a temporal and spatial separation of both the investigative and the community caretaking exercise, or is it enough, as the out-of-court Supreme Court decisions, and I cite in the brief state, that as long as there is a discreet community caretaking exercise involved, that the two may be going hand-in-hand does not mean that the community caretaking role has not been divorced from the investigation. In other words, is the question of this Court, if this officer is engaged in community caretaking wasn't simply a pretext or a subterfuge to engage in investigation. Does that answer the question that perhaps the community caretaking role could have been satisfied at an earlier point and at some point then it turned into an investigation? That is exactly what goes to, I think, the first question is were the officers properly engaged in community caretaking from the outset through the conclusion of what happened in those cases. Through the conclusion, okay. Okay, correct. And I think, and I'm glad you brought that up, Your Honor, because it does raise one issue, and I really kind of need one opposing counsel to perhaps address. The trial court in this case pressed the evidence based upon two, I guess we could call it here, discreet constitutional violations. The entry of the officers onto the pergolage without a warrant, and then the entry of the home and into the bedroom where the baby was located. The defendant, in answer to the State's appeal, focuses on the entry into the home, and the approach appears to be that the entry onto the pergolage is not really the constitutional issue here, but rather the entry into the home. It's an important consideration I bring it up now, and I want this Court to be attentive to it, because any event that the entry onto the pergolage is proper but the entry into the home is improper, it does leave the factual context to the State below about what they still have left in this case to use, because without entry onto the pergolage, we don't even have a view of the baby by these officers in this case. So this Court's aware of the facts, and I'm not going to belabor them, other than perhaps just state in a summary fashion that's acceptable. These officers were summoned to this residence after receiving a call from an individual by the name of Bieri, who was apparently friends with, or estranged friends. Yeah, we wonder about that. Yeah, so much we don't know. With the defendant and a person named Adam Snead, apparently they're both the parents There wasn't really a lot of examination in that context, but we'll assume for the sake of argument that's so. They report that Bieri, well, there's a preface to that. Bieri had gone to meet with them because they were going to a bar. They weren't at home, heard a baby crying inside. Familiar with the residence, he's familiar with the residence's dog. He kind of, you know, let himself in through a side gate to the back. Long story short, went to the back of the house, looked inside the window, and saw a baby. I don't know if it was crying at that point that he saw the baby. He said he did hear the baby crying at some point, but couldn't see the baby, and it was, you know, visible through the window. Concerned that this baby was alone because he knew he was supposed to meet his friends at the bar, and they weren't there, and now he was crying at the door, he contacted the police. So this is sort of a sketch of the facts that the police had at the time they arrived. They talked to Bieri again later, but when they arrived, they didn't go into the back. They stuck around to the front. They didn't go into the fenced-in yard. They knocked on the door. They didn't hear anything. Nothing seemed out of sorts. So at that point, they decided they were starting to leave before Bieri came back and said, hey, where are you guys going? I think they also had no interest in going into the backyard for the pit bull. That was certainly a consideration. Fortunately, Bieri and the pit bull have a good rapport, so that didn't turn out to be a problem. I also wondered about that, too. Well, you know. I'm not so brave. I don't think I would be, too. In fact, I sensed that Bieri was a little weary about the whole thing as well, the officers were. So they said, hey, where are you guys going? Kind of gave me the rundown of what was happening. So at this point, you know, they're concerned or perhaps heightened by the fact that they now had this individual who made the call there relating to circumstances. Bieri says, hey, come on back. I'll let you back there. They go back. They see the baby. It's moving. It's not crying. It doesn't appear to be in immediate distress, but they just don't know because they can't. They don't have a full view of the child. They don't know its condition. They know that it's not, like, in, you know, blue or something like that which would, you know, necessitate some exigent circumstance which would allow entry. But they also know or presume that it is alone and abandoned somewhat. I mean. It speaks on everything that people physically observe and by what Bieri has told them. The third party has told them. Told them that it is there, right. So at that point, a confound of police officers decide, well, I think our best course now, we're going to find out what's going on and where those childs are. Let's get a hold of the people who live here. And they do so. Sneed and defendant arrive back at the residence. They confront Sneed more or less and say, you know, it appears to be there's a baby here that's been left all alone. Prior to, right at the time of the arrival, the chief investigator said, you know, we need to go in and make sure this baby is okay. One of the original officers who was at the scene, Hesselbacher then, after Sneed arrives back at the residence, goes in quickly. Now, he does tell the officers, I don't want you coming in here. Look at that fact up front. I don't think that's going to make a difference to these officers because at this point, at least from the state's argument, they're still actively engaged in this process of community caretaking. Hesselbacher enters the residence. He doesn't go on any of the side routes. He goes straight to the back bedroom to check on the status of the baby. Even Sneed said that's what the officer did when the officer arrived. Along the way, I'll hurry this up, along the way, he doesn't see anyone. Hence, this is where we are now. This is the evidence that ultimately wound up being part, a really integral part of the child endangerment charges at state care. So, number one, from a community caretaking standpoint, number one, the answer to the first issue, if you will, two factors have to be involved. There's an objective set of facts which allow a reasonable officer to believe that community caretaking function is required. And number two, is it reasonable because it was done to protect the safety of the general public? So, in this instance where we have a child left alone, it's not had been crying, it's not crying anymore, it's moving. It doesn't look like it's in any significant danger or threat. But nonetheless, there's still an issue in regards to the safety and welfare of this child, which is certainly, I think, would fall under the reasonable ambit of community caretaking. Now, the Supreme Court, the Illinois Supreme Court, has instructed us that community caretaking has a Fourth Amendment invocation and, in fact, operates as a functional warrant requirement exception. So, the entry onto the courtage, if that's still an issue, entry into the home, both of which are Fourth Amendment considerations that require a warrant unless an exception applies, is satisfying in the sense that this Court is willing to accept that the officer is here. And by all the testimony except for one little blip where the officer's talked about an investigation, we're involved in community caretaking efforts. But isn't there a difference between the entrance onto the courtage and the entrance into the home in the sense that there is an adult who is supposedly the biological parent, is now on the scene and can attend to the child, and there's no reason to believe that, while there might be reason to believe the child has been neglected if it's been left alone, there's no reason to believe that the child is in danger? The reason that I would, if I could just finish this up, the reason I would disagree with that is this. If the officer's objective motives at the outset were to ensure the safety of the child, the safety of the child's status and the safety of the child is not ameliorated or changed simply by virtue of the fact that the residence owner has arrived, it doesn't make sense that this concern, if we're willing to accept it as reasonable at the outset, goes away simply because someone shows up. Because the officer's concern is not whether they showed up or not. The officer's concern, as they testified, was whether the child was okay. And until that child was verified... Well, okay because it was left alone. Well, we don't know. That's the problem. And that's sort of the heart of the community caretaking issue is to verify and to ascertain the welfare of the child. It makes no sense to say that the officers were doing what they were allowed to do in the Fourth Amendment by entering onto the curtilage and seeing the baby and wondering about its health and then turn their backs and walk away once the owner arrives. Except that couldn't they have gotten a warrant and couldn't they also have charged the couple or one or both with endangerment without going in? At this point, the officer testified he still wasn't aware that no one else was in the residence. So what's the probable cause? He also doesn't know how to investigate. I'm sorry. But then he's investigating, isn't he? That comes down to the spatial and temporal question that this Court has to answer as part of the second issue. If we're willing to accept... I've gone way over my time. Go ahead. Continue. Okay. If we are... We'll give latitude to... That's fine. Thank you. If we're willing to accept that the officers have been engaged in a community caretaking exercise throughout and that there is, as the prosecutor below sort of described in a sermon, in a strictly entwined thing here with observing things as the officer goes through the house, is it... Does it violate the precept of divorcement of the community caretaking and investigatory staff? And that's why I asked this Court to take a look at the New Hampshire and New Jersey Supreme Court cases which said no, that there is no requirement in the Constitution, the federal Constitution, the Fourth Amendment, that there be complete spatial and temporal separation of the community caretaking and investigatory, if you will, ancillary effect of the officer entering the residence. If you are willing to accept the proposition, this is really the threshold question this Court has to start with and end with, that these officers were still engaged in a proper community caretaking exercise when that officer entered not just the curtilage but into the home itself. Now, the trial court in this case never really made a definitive answer to that. She seemed to sort of throw it into the exigent circumstances, you know, bowl. And no one here is arguing that it's exigent circumstances, certainly not. Even the officers themselves recognize that it wasn't a definitive and particular legal model. So I just asked this Court, and I don't have all the time in the world, just to give consideration to the Supreme Court cases. I think they are analytically sound, and it is something that Illinois has not really quite yet addressed, but I think it's an interesting proposition about, you know, if officers do acquire evidence through the course of what would be ordinarily a community caretaking exercise, does that mean that the community caretaking exercise goes away or is no longer a consideration or no longer provides an independent justification in the Fourth Amendment for a warrantless entry? Thank you, Your Honor. May it please the Court. Counsel. Assistant Apollo Defender, Eun Sun Nam, on behalf of Erica Woods. Our position is that this is a very narrow case, a very narrow issue. Whether a felon police officer's entry into Ms. Woods' home at 1130 at night, without a warrant, without consent, without any exigency, was a valid intrusion under the community caretaking exception. So as opposing counsel- This had been going on for about three hours by then, hadn't it? Three hours. What was the original time they were called to the residence by the neighbor? So the officers, Hesselbecker and Adamson, said that they got onto the scene or at the address around 1040, 1045. Well, I thought it was earlier than that when they first got there. I think Bieri said that he called the police at 8 or 9 p.m. That's where I got that time. Yeah, but he said he wasn't sure exactly about that. The officer said that dispatch told him that Bieri had heard the baby crying maybe 10, 15 minutes before, and the officers got on the scene at 1040, 1045. He didn't take them that long to respond. I'm not sure exactly what the time frame, but as far as I remember, I think Officer Hesselbecker testified that as far as he knew, the 911 caller had called saying that he had heard the baby crying maybe 10, 15 minutes before. But they arrived, I think, as far as I know, 1040, 1045, and then Mr. Sneed and Ms. Woods came home at 1127. And after that interaction, they went into the home. I don't know how long that exact process was. But I think the main issue here is that, obviously, the police have to act reasonably, and they cannot go beyond the scope of that permissible reason for that intrusion. And here we're saying that the initial curtilage, that's a non-issue. Obviously, we have a 911 caller saying he saw a baby through the window. He's on the scene. He brings the officers to the back. They see the baby. 911 caller says that he saw the entire baby. The baby was rolling around. It was fine. Initially, he may have been crying, but by the end of it, baby's fine. But at this point, the officers don't know how long the baby has been alone or potentially alone. That's true. And I think that's one of the points that I do want to make, is that the officers constantly say that their concern was the baby's welfare, whether the baby was in distress or not, and whether the baby was unattended. And we are talking about a baby, an infant. That's correct, Your Honor. But the facts here say that the officers did see the baby. Nothing was triggered. So once the officers saw the baby through the window, I do want to point out that this is 11 o'clock at night. The baby was where the baby was supposed to be. It wasn't on the floor. The baby wasn't in, like, an adult bed. The baby was in his crib in his bedroom at 11 o'clock at night. And I think at that point, once the officers saw this baby through the window in his bedroom, they had two options. They could have either, you know, seen the baby in distress. And at that point, of course they have a duty. Of course they have a duty under the community caretaking exception to go inside the house and check on the baby's welfare. The other option was if they didn't see the baby in distress, then they needed to go get a warrant. And here, the officers actively decided together that the baby was not in distress, that they weren't going to break into the home to check on the baby. They decided instead to try. Well, did they really decide that, or did they not know? The officers, as far as I know, the testimony was that the officers decided not to go into the home. They described a situation where, in another situation, they had maybe an adult who was sleeping with a sleep mask on and didn't hear. So they described other situations. And here, once they saw that the baby was not in distress, they made that active decision not to go in. Instead, they tried to locate the parents. So they hadn't made the decision to not go in as a final decision. They made that immediate decision to not go in and attempt to find the parents. Had they not been able to locate the parents, they may have reassessed that and decided to go in. Well, that's correct, Your Honor. That's our point, is they made that decision. They tried to find the parents. And as I said, the concern was the welfare, whether the child was in distress and whether the child was unattended. The problem here is that breach of the threshold of that front door. So once the parents got there, they know the baby's not in distress, and now they know that the caretakers, the biological parents, they said that they've been at this house, they know Mr. Snead and Ms. Woods. The parents are home. At that point, that caretaking exception, that community caretaking exception is over. So, like, the examples that the cases give is, you know, if a child is lost, they help the child find a parent. If, you know, a neighbor is sick, they go check on the neighbor. Here, the worry was whether the child was in distress and whether the child was unattended. The child is not in distress. The parents are now home. And at that point, they decide to go into the home. Well, I think one of the crucial issues here is whether or not the child was in distress. I mean, they – there's a difference between not being in distress, period, and not being in immediate, urgent distress so that they have enough time to get the parents there, but they did not abandon the situation and they did not just leave. So didn't they have a duty to continue to check on the child? Well, and that's – one of the officers did testify that he remained in the back, checked on the baby until the parents arrived. So I think that was Hesselbacher. He stayed in the back by the window to check on the child. I think the issue here is if the child was in distress and the officers saw that, they had that absolute duty to go in. And I think the testimony does say that, obviously, Barry, the 911 caller, saw the entire baby, saw him rolling around. The officer said that the baby – they saw the baby's foot moving in a regular, consistent pattern. It wasn't anything that caused alarm for the officers. So our position is that the baby was not in distress. Parents came home. Caretakers were home. Now the officers no longer have that community caretaking exception available to them. At that point, they know the parents are home, baby's home, in a place where the baby's supposed to be. At that point, when they don't get consent to go into the home, but they still breach it, that was that Fourth Amendment violation. And I think that's our argument, is that this court should affirm the trial court's findings, you know, about the evidence, the statements, the observations that were made from the point of entry into the home. Not the curtilage, not anything before, but from that point that the officers intruded into the home. Because at that point, there was no warrant, there was no consent, there was no exigency, and that community caretaking exception had terminated. There was no longer that exception. And I think in Ms. Wood's brief on page 19, we talk about the scope, that the scope is important, that the officers can, you know, make a reasonable intrusion under any type of exception, but they can't go beyond that scope. And I think that's the case here, is that the curtilage was fine, but beyond that, once the parents got home, once the caretakers were home, that breach into the front door, that was the problem, and that was a Fourth Amendment violation. So let's... I understand that's your position, but it would seem that their job is not finished until they know with finality that the child is okay. And, you know, they have made sort of an intermediate decision that it's not urgent enough for them to force their way in, but to call the parents to find out what's going on and get in to check on the child. So... I do want to point out, though, that even once the officer followed Mr. Sneed into the home, I think the testimony is that the officer didn't do any type of medical check or physical check or anything like that. I know Mr. Sneed was carrying the baby, but the testimony is that they didn't do any of these checks. But I think that makes sense because the officers knew. They knew from the outside that the baby was not in distress. I think there was testimony that the... There's a difference between being able to see a baby through a window and being able to pick up the baby and hold it. Yeah, but the officers didn't pick up the baby and hold it. They followed him in. They saw the baby. But they didn't do any type of those physical, you know, examinations or anything like that. And our position is that that makes sense with the facts presented here. Unless there's any other questions. Yes, you go for the child. It's really from the point of the front door. Thank you. Thank you. Guys, I want to start with the last thing the counsel mentioned, which is regarding the physical check of the baby's welfare. Understanding, until the officers went in, the only thing they saw was a foot or feet kind of wiggling around. There is testimony of the officer who went to the bedroom and did physically observe the baby in total, if you will, and determined that there was no indication at that point that the baby was in distress or needing any medical attention. So, you know, it's a little bit of an hours and hours to say that. Well, he didn't do it. There's no worry about wanting to do more of a physical check. This is something that can be easily verified if you see the baby. All they saw before that was a couple of feet, at best, in the darkened room with a TV or computer monitor sort of glowing, you know, giving glowing light to the surroundings. I want to get back a little bit to something that counsel said and something that Justice Chapman also asked when I was up here initially regarding the obtaining of a warrant. And this is kind of sticking with me for the last few minutes because my concern is when we start talking about issues of, well, could the police or should the police have obtained a warrant, I think infuses the analysis of this case with Fourth Amendment investigatory functions, which our argument is was not part and parcel of this case from the beginning. Yeah, but it does highlight the fact that maybe they didn't think there was a huge distress issue, that they waited and called the parents and waited until they showed up. Police officers engaging in ordinary, normal activities are going to be confronted with a variety of facts. When Your Honor says something like huge distress, you know, the immediate ordinary officer will understand that to be, if they're properly trained, an exigent circumstance in which a warrantless and perhaps violent entry into the home is required. And I think the Constitution would perfectly allow such a situation because of the balancing circumstances. The problem that we have here is that we don't have a huge distress. What we do have is a giant mystery of a baby under the age of one with an independent witness reporting the baby's been left alone, having crime but no longer crime anymore, the inability to see the child from a vantage point to ascertain its condition. The police officers here acted absolutely reasonably under that set of factual circumstances. I don't want to make grand pronouncements, but the police are in a bit of a pickle now. I mean, what are they supposed to do under these circumstances? And to say that, well, once they arrive, you know, this community care team exercise, you know, dissipates into vapor and they should go away, I think doesn't really accurately reflect the ongoing function of police officers' concerns that we all want police officers to have to ensure the safety of citizens. So, again, I think if the court can arrive at that particular conclusion and say that we can comfortably say that these officers were engaged in a primary function of community care taking, then the fact that ancillary to the undertaking of that role, they observe facts. And, again, these observations of facts would be what any reasonable police officer would believe when they enter into a home where they do not know if anyone is still inside the residence. So you walk through the house and saw no one was there. Well, officers can't ignore their surroundings when they walk in. That just goes against their training and really goes against common sense. It doesn't transform it into an investigation. I do want to make one mention of that. There is some emphasis both in the trial court below and in the defendant's briefing on the officer who was cross-examined by counsel. So, yeah, I was investigating. I do want to point out that, first of all, some objective criteria, something that the officer characterizes and not necessarily the point of fact that defines what happened here. But officers are trained by virtue of what they do to think everything is an investigation. I would measure that if an officer who comes up to the side of the road and sees a car off on a ditch with those lights flashing would say, yeah, I decided to stop and investigate what was happening because I was concerned someone was injured. That doesn't mean it's a fourth amendment investigation. It just means that's what the officers are doing in the course of their duties. So I would ask the court to not place over-emphasis on that particular characterization, which counsel below made great light of, because it doesn't really define anything. And I think it steps away from the necessity of objective evaluation of the totality of the circumstances. In the brief few seconds I have left, I do want to talk about counsel's reference to scope of the community caretaking function. And this, defendant, relies upon the recruit case. But I think if you look at that decision, you'll see that once the basis or the objective of the community caretaking function is completely satisfied, as it was in that case where it was to ensure that a resident of an apartment or something can come in safely without fear of the occupant, then that's where the community caretaking function stops. That comes back to what I'm saying here right now. There was never an extinguishment of the scope of that community caretaking exercise until the police officers could verify that this child was safe in the apartment. Thank you. Thank you, counsel. The court will take this case under advisement and issue its decision.